MELINDA HAAG (CSBN 132612)
United States Attorney

ALEX G. TSE (CSBN 152348)
Chief, Civil Division

STEVEN J. SALTIEL (CSBN 202292)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6996
     FAX: (415) 436-6748
     steven.saltiel@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
| Plaintiff, | **UNITED STATES' COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SPRINT COMMUNICATIONS, INC., formerly known as SPRINT NEXTEL CORPORATION; SPRINT PCS, | |
| Defendants. | |

For its Complaint, Plaintiff, the United States of America, alleges as follows:

### I. NATURE OF ACTION

1. The United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law theories of unjust enrichment and payment by mistake.

2. The United States bases its claims on Defendants' submission of false claims for reimbursement of expenses they incurred in providing facilities or assistance to federal law enforcement

UNITED STATES' COMPLAINT

agencies in executing court orders authorizing the interception of a wire, oral, or electronic communication (commonly referred to as a "wiretap"), and orders authorizing the installation of a pen register or trap device.  A pen register is a device that records or decodes dialing, routing, addressing or signaling information transmitted by a particular telephone line, but not the contents of a communication.  18 U.S.C. § 3127(3).  A trap device is a device or process that captures the incoming impulses which identify the source of a communication, but not its contents.  18 U.S.C. § 3127(4).

3.  Within the time frames detailed below, Defendants Sprint Communications, Inc. and Sprint PCS (collectively referred to as "Sprint") knowingly submitted false claims to federal law enforcement agencies, such as the Federal Bureau of Investigation (FBI), Drug Enforcement Agency (DEA), U.S. Marshals Service (USMS), Bureau of Alcohol, Tobacco and Firearms (ATF), Immigration and Customs Enforcement (ICE), and others, by including unallowable costs in their charges for carrying out court orders authorizing wiretaps, pen registers, and trap devices.

4.  Like other providers of wire or electronic communications, Sprint is authorized by statute to bill law enforcement agencies for the reasonable expenses it incurs in providing facilities or assistance to accomplish a wiretap, pen register, or trap device (referred to herein as "intercept charges").  18 U.S.C. §§ 2518(4), 3124(c).  In 1994, Congress passed the Communications Assistance in Law Enforcement Act, Pub. L. No. 103-414, 108 Stat. 4279 (1994) ("CALEA"), which required telecommunications carriers to ensure that their equipment, facilities, or services were capable of enabling the government, pursuant to a court order, to intercept and deliver communications and call-identifying information.  47 U.S.C. § 1002(a).  On May 12, 2006, the Federal Communications Commission (FCC) resolved a dispute between law enforcement agencies and telecommunications carriers, and ruled that carriers were prohibited from using their intercept charges to recover the costs of modifying equipment, facilities or services that were incurred to comply with CALEA.  *In the Matter of Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295, RM-10865, Second

Report and Order and Memorandum Opinion and Order, 21 F.C.C.R. 5360, ¶¶ 69-74 (May 12, 2006) ("*Second Report and Order*").  The FCC ruled that the carriers' exclusive mechanism for recovering these costs was from the United States Attorney General, under the limitations set forth in section 109 of CALEA.  Sprint participated in the FCC rulemaking proceeding.

5.  Despite the FCC's clear and unambiguous ruling, Sprint knowingly included in its intercept charges the costs of financing modifications to equipment, facilities, and services installed to comply with CALEA.  Because Sprint's invoices for intercept charges did not identify the particular expenses for which it sought reimbursement, federal law enforcement agencies were unable to detect that Sprint was requesting reimbursement of these unallowable costs.

6.  By including the unallowable costs of financing CALEA modifications in their intercept charges, Sprint inflated its charges by approximately 58%.  As a result of Sprint's false claims, the United States paid over $21 million in unallowable costs from January 1, 2007 to July 31, 2010.

## II.  JURISDICTION AND VENUE

7.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a), and 31 U.S.C. § 3732.  The Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District.

8.  Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District.

## III.  INTRADISTRICT ASSIGNMENT

9.  This action did not arise in any one county of this District for the purposes of Civil L.R. 3-2(c).

## IV.  PARTIES

10.  The United States brings this action on behalf of all federal law enforcement agencies ("LEAs"), including the FBI, DEA, USMS, ATF, ICE, United States Postal Inspection Service (USPIS),

Internal Revenue Service (IRS), the Defense Criminal Investigative Service (DCIS), and the United States Secret Service.

11.  Defendant Sprint Communications, Inc., formerly known as Sprint Nextel Corporation, is a Kansas corporation with its principal place of business in Overland Park, Kansas.  Sprint Communications, Inc. is a wholly owned subsidiary of Sprint Corporation.  At all times relevant to the complaint, Sprint Communications, Inc. was a communications company offering wireless and wireline communications products and services in all fifty states, Puerto Rico, and the U.S. Virgin Islands.

12.  Defendant Sprint PCS is a joint venture established in 1994 by Sprint Communications, Inc., TCI, Comcast Corporation, and Cox Communications, Inc.  In 1998, Sprint Communications, Inc. assumed 100% ownership and management control of Sprint PCS.  At all times relevant to the complaint, Sprint PCS submitted invoices for intercept charges to LEAs.

## V.  THE FALSE CLAIMS ACT

13.  The False Claims Act, 31 U.S.C. §§ 3729-33, provides, in pertinent part, that:

> [A]ny person who—
>
> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

14.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999.

15.  The False Claims Act defines "knowing" and "knowingly" as follows:

UNITED STATES' COMPLAINT

[T]he terms "knowing" and "knowingly"—

    (A)  mean that a person, with respect to information—

        (i)     has actual knowledge of the information;

        (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

        (iii)   acts in reckless disregard of the truth or falsity of the information; and

    (B)  require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

## VI. STATUTORY AND REGULATORY FRAMEWORK FOR INTERCEPT CHARGES

### A. <u>Cost Recovery Pursuant to Intercept Statutes</u>

16.  Telecommunications carriers are authorized by statute to recover their "reasonable expenses" in complying with a valid wiretap order.  18 U.S.C. § 2518(4) provides, in pertinent part:

> An order authorizing the interception of a wire, oral, or electronic communication under this chapter shall, upon request of the applicant, direct that a provider of wire or electronic communication service . . . shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such service provider . . . is according the person whose communications are to be intercepted.  Any provider of wire or electronic communication service . . . furnishing . . . such facilities or technical assistance shall be compensated therefor by the applicant for reasonable expenses incurred in providing such facilities or assistance.

17.  Similarly, with respect to pen registers and trap devices, 18 U.S.C. § 3124(c) provides, in pertinent part, that a "provider of a wire or electronic service . . . who furnished facilities or technical assistance pursuant to this section shall be reasonably compensated for such reasonable expenses incurred in providing such facilities and assistance."

### B. <u>Communications Assistance for Law Enforcement Act</u>

18. In 1994, Congress passed CALEA.  Congress described CALEA as an Act "to make clear a telecommunications carrier's duty to cooperate in the interception of communications for law enforcement purposes."  The legislative purpose of CALEA was to "preserve the government's ability,

pursuant to court order or other lawful authorization, to intercept communications involving advanced technologies such as digital or wireless transmission modes, or features and services such as call forwarding, speed dialing and conference calling, while protecting the privacy of communications and without impeding the introduction of new technologies, features, and services." H.R. Rep. No. 103-827(I), 1994 U.S.C.C.A.N. 3489.

19. Section 103 of CALEA provides, in pertinent part, that:

[A] telecommunications carrier shall ensure that its equipment, facilities, or services that provide a customer or subscriber with the ability to originate, terminate, or direct communications are capable of—

(1) expeditiously isolating and enabling the government, pursuant to a court order or other lawful authorization, to intercept, to the exclusion of any other communications, all wire and electronic communications carried by the carrier within a service area to or from equipment, facilities, or services of a subscriber of such carrier concurrently with their transmission to or from the subscriber's equipment, facility, or service, or at such later time as may be acceptable to the government;

(2) expeditiously isolating and enabling the government, pursuant to a court order or other lawful authorization, to access call-identifying information that is reasonably available to the carrier—

(A) before, during, or immediately after the transmission of a wire or electronic communication (or at such later time as may be acceptable to the government); and

(B) in a manner that allows it to be associated with the communication to which it pertains, except that, with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices (as defined in section 3127 of title 18, United States Code), such call-identifying information shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number);

(3) delivering intercepted communications and call-identifying information to the government, pursuant to a court order or other lawful authorization, in a format such that they may be transmitted by means of equipment, facilities, or services procured by the government to a location other than the premises of the carrier; and

(4) facilitating authorized communications interceptions and access to call-identifying information unobtrusively and with a minimum of interference with any subscriber's telecommunications service and in a manner that protects—

(A)  the privacy and security of communications and call-identifying information not authorized to be intercepted; and

(B)  information regarding the government's interception of communications and access to call-identifying information.

47 U.S.C. § 1002(a).

20.  Section 109 of CALEA authorized the U.S. Attorney General, subject to the availability of funds, to "pay telecommunications carriers for all reasonable costs directly associated with the modifications performed by carriers in connection with equipment, facilities, and services installed or deployed on or before January 1, 1995, to establish the capabilities necessary to comply with section 103."  47 U.S.C. § 1008(a).  The Attorney General was authorized to pay the reasonable costs of equipment, facilities, or services deployed after January 1, 1995 only upon a determination by the FCC that compliance with Section 103 of CALEA was not "reasonably achievable."  47 U.S.C. § 1008(b). Pursuant to section 109(e) of CALEA (codified at 47 U.S.C. § 1008(e)), the Attorney General promulgated regulations to effectuate the submission of claims by, and payment to, telecommunications carriers for the reasonable costs of compliance with section 103.  These regulations are codified at 28 C.F.R. § 100.9 *et seq.*  Claims submitted under these regulations were separate and distinct from carriers' intercept charges, i.e., their claims for the reasonable expenses of providing facilities or assistance in complying with a valid intercept order.

21.  Congress appropriated a total of $500,000,000 for fiscal years 1995, 1996, 1997, and 1998, to carry out Title I of CALEA.  47 U.S.C. § 1009.

C.    **FCC Second Report and Order**

22.  In March 2004, the U.S. Department of Justice, the FBI, and the DEA filed a petition for expedited rulemaking with the FCC, requesting that the FCC initiate a proceeding to resolve various outstanding issues relating to the implementation of CALEA.  The FCC responded in August 2004 by issuing a Notice of Proposed Rulemaking.  *Second Report and Order*, ¶ 4.  Many telecommunications

1   carriers, including Sprint, participated in this proceeding by submitting comments.

2       23.   In September 2005, the FCC issued its *First Report and Order* in the rulemaking

3   proceeding.  *See Communications Assistance for Law Enforcement Act and Broadband Access and*

4   *Services*, *First Report and Order and Further Notice of Proposed Rulemaking,* ET Docket No. 04-295,

5   RM-10865, 20 FCC Rcd 14989 (2005).  The *First Report and Order* stated: "In the coming months, we

6   will release another order that will address separate questions regarding the assistance capabilities

7   required of the providers covered by today's Order pursuant to section 103 of CALEA.  This subsequent

8   order will include other important issues under CALEA, such as compliance extensions and exemptions,

9   *cost recovery*, identification of future services and entities subject to CALEA, and enforcement."  *Id*.,

10  ¶ 3 (emphasis added).

11

12      24.   On May 12, 2006, the FCC issued its *Second Report and Order* in the rulemaking

13  proceeding.  In its Notice of Proposed Rulemaking, the FCC sought comment on a number of issues

14  related to the recovery of CALEA compliance costs, including the nature of such costs and from which

15  parties the costs could be recovered.  The FCC also inquired into CALEA cost recovery pursuant to

16  intercept statutes (e.g., 18 U.S.C. §§ 2518(4), 3124(c)).  *Second Report and Order*, ¶ 69.

17

18      25.   In its Notice of Proposed Rulemaking, the FCC acknowledged its prior statement in an order

19  suggesting that carriers could recover a portion of their CALEA capital costs through intercept charges

20  imposed on LEAs, and that this statement was made without the benefit of a complete and full record on

21  the issue.  In the *Second Report and Order*, the FCC repudiated its prior statement:

22

23          " . . . because we now conclude that CALEA section 109 provides the *exclusive* mechanism by
            which carriers may recover from law enforcement capital costs associated with meeting the
24          capability requirements of CALEA section 103, the Commission's prior statement was incorrect
            to the extent it suggested that carriers may recover CALEA capital costs through intercept
25          charges."

26  *Second Report and Order*, ¶ 71 (emphasis in original).

27      26.   The FCC reasoned that, because CALEA makes the government responsible for compliance

28

UNITED STATES' COMPLAINT

costs for the period on or before January 1, 1995, and places the responsibility for compliance costs after January 1, 1995 on carriers (absent a finding by the FCC that compliance is not reasonably achievable), allowing carriers to recover CALEA compliance costs from the government through intercept charges would be inconsistent with the cost recovery methodology set forth in § 109.  The FCC stated that:

> Allowing carriers to recover CALEA compliance costs from the government through other means, such as through intercept charges, would be inconsistent with the cost recovery methodology set forth in CALEA section 109 because it would disrupt the cost burden balance between law enforcement and carriers carefully crafted by Congress in enacting CALEA. In short, as DOJ notes, it "would essentially allow carriers to do an 'end-run' around the provisions of section 109(b) and Congressional intent."

*Second Report and Order*, ¶ 71.

27.  With respect to the carriers' ability to recover CALEA compliance costs through intercept charges, the FCC ruled as follows:

> We therefore conclude that, while carriers possess the authority to recover through intercept charges the *costs associated with carrying out an intercept* that is accomplished using a CALEA-based intercept solution, they are prohibited by CALEA from recovering through intercept charges the *costs of making modifications to equipment, facilities, or services* pursuant to the assistance capability requirements of CALEA section 103 and the *costs of developing, installing, and deploying CALEA-based intercept solutions* that comply with the assistance capability requirements of CALEA section 103.

*Second Report and Order*, ¶ 71 (emphasis added).

28.  The FCC found that, "to the extent carriers do not meet the necessary criteria for obtaining cost recovery pursuant to section 109(b) of CALEA, carriers may absorb the costs of CALEA compliance as a necessary cost of doing business, or, where appropriate, recover some portion of their CALEA section 103 implementation costs from their subscribers."  *Second Report and Order*, ¶ 72.  The FCC declined to adopt a national surcharge to recover CALEA costs.  *Second Report and Order*, ¶ 73.

## VII.  FACTUAL ALLEGATIONS

29.  Pursuant to 18 U.S.C. § 2518(4) and 18 U.S.C. § 3124(c), Sprint, at all times relevant to the complaint, sought reimbursement of the expenses it incurred in complying with orders authorizing wiretaps, pen registers, and trap devices (collectively referred to as "intercepts") by charging LEAs the

UNITED STATES' COMPLAINT

rates contained on Sprint's Electronic Surveillance Fee Schedule. Sprint's fees included an implementation fee charged per intercept and per geographic area (referred to as a "market"), and a daily maintenance fee.

30. Sprint determined its fees by calculating its average cost per intercept, using a cost model that purported to divide the company's expenses in executing intercept orders (the numerator or costs) by the average number of intercepts projected over a period of time (the denominator or demand).

31. Prior to May 12, 2006, when the FCC issued its *Second Report and Order*, Sprint included in its intercept charges to LEAs the costs of its capital investment in equipment, facilities, and services to comply with section 103 of CALEA.

32. In July 2006, after the FCC issued the *Second Report and Order*, Sprint revised its cost model by removing the capitalized costs (i.e., depreciation) of the equipment and upgrades in which it invested in order to comply with section 103 of CALEA.

33. Although Sprint removed depreciation on its investment in CALEA equipment and upgrades from the cost model, Sprint continued to include in its charges to LEAs the costs of financing that investment, including: (1) the "cost of debt," the annual interest expense on loans the proceeds of which were used to invest in CALEA equipment; (2) the "cost of equity," the dividend payments or growth in stock value to shareholders from an additional stock offering or drawing on existing equity of the company used to invest in CALEA equipment; and (3) taxes associated with both the "cost of debt" and "cost of equity."

34. By including these expenses in its cost model, Sprint violated the FCC's prohibition against using intercept charges to recover from LEAs the costs of making modifications to equipment, facilities, and services in order to comply with section 103 of CALEA, and/or the costs of developing, installing, and deploying CALEA-based intercept solutions in order to comply with section 103 of CALEA.

35. Based on the July 2006 cost model, Sprint published a revised Electronic Surveillance Fee

Schedule with revised fees.  Sprint billed LEAs these fees for carrying out intercepts.

36.  Sprint did not publish or otherwise disclose to LEAs the July 2006 cost model on which the revised fees were based.  Sprint did not disclose to LEAs that the costs of financing its investment in CALEA equipment were included in its intercept charges.

37.  In or about June 2010, Sprint again revised the cost model on which its intercept charges are based.  In the June 2010 cost model, Sprint removed the costs of financing its investment in CALEA equipment, including the cost of debt, cost of equity, and associated taxes.  Effective August 1, 2010, Sprint lowered its intercept charges based on the June 2010 cost model.  As of this date, Sprint has failed or refused to refund the overpayments made by LEAs based on its pre-August 1, 2010 fees, as described below.

## VIII. FALSE CLAIMS

38.  During the period January 1, 2007 to July 31, 2010, pursuant to 18 U.S.C. § 2518(4) and 18 U.S.C. § 3124(c), Sprint submitted over 29,000 claims to LEAs for reimbursement of its reasonable expenses in carrying out intercepts, charging fees based on the July 2006 cost model.  These claims were false because, as described above, the fees charged to the LEAs included hidden costs that the FCC ruled were unallowable.

39.  Sprint submitted these claims in the form of invoices to LEAs from its Subpoena Compliance Department.

40.  By way of example, from January 1, 2007 to July 31, 2010, Sprint submitted invoices for intercept charges to the following LEAs, for which the LEAs paid the following amounts:

| | |
|---|---|
| FBI | $10,582,237 |
| DEA | $20,973,813 |
| USMS | $ 3,237,435 |
| ATF | $   461,781 |

UNITED STATES' COMPLAINT

|  |  |
|---|---|
| ICE | $ 2,396,342 |
| Secret Service | $    31, 141 |

41.  As described above, the payments made by LEAs to Sprint for intercept charges included the costs of financing Sprint's investment in CALEA equipment, including the cost of debt, cost of equity, and associated taxes, in violation of the *Second Report and Order*.  By including these unallowable costs in its intercept charges, Sprint inflated its charges by approximately 58%.  As a result of Defendants' false claims, the United States paid over $21 million in unallowable costs from January 1, 2007 to July 31, 2010.

## IX.    TOLLING OF STATUTE OF LIMITATIONS

42.  Sprint executed a series of tolling agreements with the United States tolling the running of time under any applicable statute of limitations, by way of laches or other time limitation (whether statutory, contractual or otherwise) for the period of time between February 1, 2012 and the date of filing suit or March 3, 2014, whichever is earlier.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1)(A))

43.  The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

44.  Sprint knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States for reimbursement of its expenses in furnishing facilities and assistance in carrying out intercepts.

45.  By virtue of the false or fraudulent claims presented or caused to be presented by Sprint, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

UNITED STATES' COMPLAINT

**SECOND CAUSE OF ACTION**

(Unjust Enrichment)

46.  The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

47.  As a consequence of the acts described above, Sprint was unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

48.  The United States claims the recovery of all monies by which Sprint has been unjustly enriched.

**THIRD CAUSE OF ACTION**

(Payment by Mistake)

49.  The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

50.  Sprint was not entitled to receive payment from LEAs for the annually recurring expenses of financing Sprint's investment in CALEA equipment, including the cost of debt, cost of equity, and associated taxes.

51.  The United States, through the LEAs, paid Sprint for the costs of financing Sprint's investment in CALEA equipment, including the cost of debt, cost of equity, and associated taxes, without knowledge of material facts, and under the mistaken belief that the United States was paying for Sprint's allowable costs in furnishing facilities and assistance in carrying out intercepts.  The United States' mistaken belief was material to its decision to pay Sprint for such claims.  Accordingly, Sprint is liable to account and pay to the United States the amounts of the payments made in error.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Sprint as follows:

1.  On the First Cause of Action under the False Claims Act, for the amount of the United States'

UNITED STATES' COMPLAINT

damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

2.  On the Second Cause of Action for unjust enrichment, for the amounts by which Sprint were unjustly enriched, plus interest, costs, and expenses, and for such further relief as may be just and proper.

3.  On the Third Cause of Action for payment by mistake, for an amount equivalent to the loss sustained by the United States, plus interest, costs, and expenses, and for such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a jury trial in this case.

DATED: March 3, 2014                                Respectfully submitted,

                                                    MELINDA HAAG
                                                    United States Attorney

                                                    */s/ Steven J. Saltiel*
                                                    STEVEN J. SALTIEL
                                                    Assistant United States Attorney

UNITED STATES' COMPLAINT

14